1
2
3
4
5
6
7
8
IN THE UNITED STATES DISTRICT COURT

9
FOR THE EASTERN DISTRICT OF CALIFORNIA

10 YVETTE SMITH,

11          Plaintiff,                    No. CIV S-09-1982 GGH

12      vs.

13
MICHAEL J. ASTRUE,                    ORDER
14 Commissioner of
Social Security,

15
          Defendant.
16 _____/

17          Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18 Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB")

19 under Title II of the Social Security Act ("Act").  For the reasons that follow, Plaintiff's Motion

20 for Summary Judgment is denied, the Commissioner's Cross Motion for Summary Judgment is

21 granted, and the Clerk is directed to enter judgment for the Commissioner.

22 BACKGROUND

23          Plaintiff, born April 11, 1969, applied on March 26, 2007 for disability benefits.

24 (Tr. at 98.)  Plaintiff alleged she was unable to work due to migraines, diabetes, hypoglycemia,

25 asthma, joint pain in the knees, carpal tunnel syndrome, tennis elbow, impaired vision in left eye,

26 arthritis, and increased pain in the right hand, arm, elbow and shoulder.  (Tr. at 108, 149.)   In a

1

decision dated January 23, 2009, ALJ Peter F. Belli determined that plaintiff was not disabled.

The ALJ made the following findings:[1]

> 1. The claimant met the insured status requirements of the Social Security Act through March 31, 2008.
>
> 2. The claimant has not engaged in substantial gainful activity since March 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairments: diabetes, amblyopia, degenerative disc and joint disease, right wrist tendinopathy, peripheral neuropathy, migraines and obesity (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 404.925 and 416.926).

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
>
> Step two:  Does the claimant have a "severe" impairment? If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
>
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
>
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
>
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  She is able to lift/carry/push/pull 10 pounds occasionally and 5 pounds frequently; sit for eight of eight hours with normal breaks; stand/walk for eight of eight hours with normal breaks; occasionally stoop, crouch, crawl and kneel; and frequently grasp and finger.  She requires the opportunity to sit or stand at will while not leaving her work station and is precluded from climbing ladders, ropes and scaffolding.

6.    The claimant is capable of performing past relevant work as a dorm supervisor.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2006 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. at 12-19.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A.  Whether the ALJ Failed to Credit the Opinion of Plaintiff's Treating Nurse Practitioner; B.  Whether the ALJ Failed to Properly Assess the Impact of Plaintiff's Obesity Pursuant to SSR 02-01p; and C.  Whether the ALJ Failed to Properly Credit Plaintiff's Testimony and Third Party Statements Regarding Plaintiff's Functional Limitations.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

3

625, 630 (9th Cir. 2007), *quoting* Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

ANALYSIS

    A.  Nurse Practitioner's Opinion

Plaintiff claims that the ALJ failed to credit the opinion of Nurse Practitioner Smitt, plaintiff's treating source.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[2]  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons.  Lester , 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating

---

[2]  The regulations differentiate between opinions from "acceptable medical sources" and "other sources."  See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources."  Id.  Medical opinions from "acceptable medical sources," have the same status when assessing weight.  See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific regulations exist  for weighing opinions from "other sources."  Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001),[3] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

A nurse practitioner is not considered an acceptable medical source, but only an "other source."  20 CFR § 416.913(a), (d)(1) (2008).  Nevertheless, plaintiff correctly refers to SSR 06-3p which explains that in some instances other sources, such as chiropractors and nurse practitioners, may be given more weight than acceptable medical sources.  Espino v. Astrue, 2010 WL 1980327, *3 (W.D. Wash. 2010).  These sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  SSR06-03p.  "Among the factors considered in assigning weight and/or rejecting 'other medical source' opinions is how often the source has seen the individual, and if her opinion has better supporting evidence than a conflicting acceptable medical source opinion."  Reynolds v. Astrue, 2010 WL 3516895, *8 (E.D. Wash. September 3, 2010).  In order to reject the testimony of other medical sources, the ALJ must give "individualized germane reasons."  Smolen, 80 F.3d at 1288-89.

In regard to NP Smitt, the ALJ summarized her opinion in 2005 and 2006 that

---

[3]  The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

plaintiff could only work four to six hours a day, but that in 2007, plaintiff's health had worsened considerably and she could no longer work.  (Tr. at 17, 374.)  NP Smitt repeated this opinion in 2008.  (Id. at 569.)  The ALJ gave minimal weight to the later opinions that plaintiff was totally disabled because they did "not take into account the previous positive response and improvement in symptoms through the use of established treatment regimens."  (Id.)

The ALJ acknowledged that the earlier studies of plaintiff's knees showed no significant changes in 2006; however, he conceded that the June, 2007 study showed moderate narrowing of the knee joints and an October, 2007 study showed a right knee tear.  (Id. at 17, 261, 331, 387, 499.)  The 2006 study also indicated "congenital variant anatomy of the bilateral knees, resulting in altered alignment, as described, which may be predisposing for knee instability and early degenerative joint disease."  (Id. at 261.)  A September, 2008 report referred to an October, 2007 MRI indicating "a complex tear of the anterior and lateral meniscus," and the latest imaging studies indicating "mild medial compartment DJD."  The recommendation at this time was to continue with physical therapy, which she had just started.  Arthroscopic surgery would be considered at a later time.[4]  Symptoms at this time were "very limited."  (Id. at 499.)  As the ALJ correctly summarized, this treating physician, Dr. Meehan, specifically noted that there was "some improvement," despite the presence of the complex tear.  (Id.)

Plaintiff also received physical therapy on April 9 and 18, 2008.  The physical therapist opined that plaintiff would benefit from skilled physical therapy.  (Id. at 502.)  At the time physical therapy began, plaintiff experienced right knee pain after walking up to thirty minutes and standing up to thirty minutes.  (Id.)  This level of impairment is not consistent with NP Smitt's opinion that plaintiff could not work at all.  Sedentary work, as found by the ALJ, consists of standing or walking for no more than two hours out of an eight hour work day.  Sitting generally takes six hours of the work day.  SSR 83-10.  Plaintiff's own description of her

---

[4] Plaintiff testified at hearing, however, that she did not want this surgery because she was scared.  (Id. at 36.)

1  limitations as described to the physical therapist are consistent with being able to do sedentary

2  work.

3          Admittedly prior to the meniscus tear, but nevertheless relevant is Dr. Selcon's

4  consultative report, dated March 14, 2007.  This internist had available to him the September,

5  2006 knee x-rays.  In regard to this ailment in particular, Dr. Selcon noted that plaintiff did not

6  walk with a limp or an assistive device, but was wearing knee braces.  (Id. at 276, 277.)  Range

7  of motion of the knees was normal, with no effusion and no mediolateral or anteroposterior

8  instability.  (Id. at 277.)

9          Dr. Selcon also noted that although plaintiff had asthma, she had never been

10  hospitalized for it, and had never taken prednisone for it.  (Id. at 275.)  In regard to plaintiff's

11  right wrist, elbow and shoulder, Dr. Selcon found no tenderness and range of motion was normal.

12  (Id. at 277.)  This finding is supported by the x-rays which were unremarkable.  (Id. at 333-35.)

13  In regard to all ailments, Dr. Selcon diagnosed diabetes, asthma, "knee pain of uncertain

14  etiology," right shoulder and elbow pain, and blindness in the left eye.  (Id. at 278.)   He

15  concluded that plaintiff had no functional limitations.  (Id.)

16          The ALJ also noted with respect to the back impairment that even the more recent

17  medical records did not show a significant impairment.  For example, exam of the lumbar spine

18  on June 19, 2008 did not show an obvious impairment, despite plaintiff's complaints of pain and

19  worsening of her back problems that same day.  (Id. at 17, 556-57.)  An August 21, 2008 MRI of

20  the lumbar spine indicated degenerated discs at L4-5 and L5-S1, but no significant compression

21  of any nerve roots.  (Id. at 17, 567.)

22          Plaintiff also contends that the treatment record indicated worsening migraine

23  headaches, including three emergency room visits in 2007.  When plaintiff complained of

24  migraines on September 28, 2006, there was a note to refer her to a neurologist and a prescription

25  \\\\\

26  \\\\\

1  for Neurontin.[5]  (Tr. at 231.)   On October 19, 2006, plaintiff's migraines were not bothering her.

2  She was directed to continue her medication.  (Id. at 227.)   In January, 2007, plaintiff reported

3  that she was getting no relief from her migraines.  The plan was to start Darvocet.  (Id. at 225.)

4          Dr. Pagdan, a neurologist, saw plaintiff on March 9, 2007.  She reported that she

5  had migraines three or four times a month, and that they lasted up to four days.  Plaintiff was

6  given new prescriptions for Topamax and Zomig.  She was to return in one month with a

7  headache diary.  (Id. at 302.)  There is no record that plaintiff returned to this neurologist with a

8  headache diary one month later or any time after that.  In fact, she testified at the hearing that she

9  had never kept a headache log.  (Id. at 33.)  The next notation after that time is on July 3, 2007,

10  when plaintiff reported that she went to the emergency room with a migraine headache.  (Id. at

11  548.)  In regard to her migraine reports, on August 3, 2007, the note was that she should follow

12  up with a neurologist.  (Id. at 547.)  It is true that plaintiff went to the emergency room three

13  times with migraine headaches, on June 20, June 22[6], and August 8, 2007.  (Id. at 365, 353, 346.)

14  At one of the visits, plaintiff reported that she had seen a neurologist but was seeking a new

15  neurologist.  (Id. at 353.)  These ER visits may have been related to the lack of steady

16  neurological care during this short time period.  There were no other ER visits in the record.

17  Although plaintiff did have migraines, the ER visits did not increase over time but were limited

18  to a short finite period which, possibly coincidentally, was at the same time plaintiff was seeking

19  new neurologic treatment.  Plaintiff's migraines do not appear to have worsened over time.

20          As to plaintiff's diabetes, and contrary to plaintiff's assertions, there are only two

21  notations in this voluminous record indicating that plaintiff's diabetes was not well controlled.

22  (Tr. at 499, 563.)  Furthermore, on questioning by the ALJ, plaintiff testified that she does not

23  control her diet.  She testified that she was unaware of the American Diabetic Association Diet

24

25       [5]  Neurontin is used to prevent migraine headaches.  www.migraines.org.

26       [6]  This visit was a continuation of the headache from the first visit that had not resolved.  (Id. at 353.)

1   and had never discussed a diabetic diet with her doctor.  (Id. at 34.)  The records are to the

2   contrary.  There are multiple notations recommending diet (and exercise).  (Tr. at 563, 420, 416.)

3   A condition which can be controlled or corrected by medication is not disabling.  See Montijo v.

4   Secretary of HHS, 729 F.2d 599, 600 (9th Cir. 1984) (Addison's Disease controlled with

5   medications deemed not disabling); Odle v. Heckler, 707 F.2d 439, 440 (9th Cir.1983) (rib

6   condition controlled with antibiotics not considered disabling).

7          Although Dr. Selcon had made no significant findings in regard to plaintiff's right

8   wrist and elbow, as discussed *supra*, it appears that on March 16, 2008 an MRI indicated

9   extensor carpi ulnaris tendinopathy in the right wrist.  (Id. at 383.)  Although this report was

10  definitely worse than the x-ray of the wrist on March 23, 2007, which was unremarkable, (tr. at

11  333), it still does not explain NP Smitt's opinion that plaintiff could not work at all.  The x-rays

12  of plaintiff's right elbow and shoulder were normal at this time, and there is no record indicating

13  that they worsened later.  (Id. at 334, 335.)

14         The two reports indicating a worsening in plaintiff's overall condition are dated

15  May 19 and 27, 2008.  They show that plaintiff's knee and back pain were increasing, as were

16  her blood sugar and asthma.  At this time, plaintiff's weight was also increasing up to 234

17  pounds, up from 203 pounds in 2006.  (Id. at 563, 564, 225.)  At this time, plaintiff was counseled

18  to diet and exercise.  (Id. at 563-64.)  It is no coincidence that plaintiff's problems worsened with

19  her increased weight, and would likely improve if she lost weight.  In any event, the worsening of

20  *some* of her conditions was not significant enough to warrant such an extreme change in NP

21  Smitt's opinion.  The remainder of the record, as noted by the ALJ, does not contain any medical

22  evidence indicating such a debilitating level of function.  (Id. at 16.)

23         Finally, Nurse Smitt's opinion on disability is not binding on the ALJ.  "A

24  statement by any physician that the claimant is disabled or unable to work is a conclusion on the

25  ultimate issue to be decided . . . and is not binding on the [ALJ] in reaching his determination as

26  to whether the claimant is disabled within the meaning of the [Act]."  Murray v. Heckler, 722

1    F.2d 499 (9th Cir. 1983), (citing <u>Burkhart v. Bowen</u>, 856 F.2d 1335 (9th Cir. 1988), 20 C.F.R. §§

2    404.1527 and 404.927); <u>accord</u>, <u>Magallanes v. Bowen</u>, 881 F.2d 747, 750-51 (9th Cir. 1989).

3            It was the ALJ's province to choose between Dr. Selcon's report and NP Smitt's

4    opinion.  "Where the opinion of the claimant's treating physician is contradicted, and the opinion

5    of a nontreating source is based on independent clinical findings that differ from those of the

6    treating physician, the opinion of the nontreating source may itself be substantial evidence; it is

7    then solely the province of the ALJ to resolve the conflict."  <u>Andrews v. Shalala</u>, 53 F.3d 1035,

8    1041 (9th Cir. 1995), citing <u>Magallanes</u>, 881 F.2d at 751.

9        B.  <u>Whether the ALJ Failed to Properly Assess the Impact of Plaintiff's Obesity Pursuant</u>

10   <u>to SSR 02-01p</u>

11           Plaintiff next contends that the ALJ failed to consider her obesity pursuant to

12   Social Security Ruling 02-01p, in combination with her other impairments.  At five feet eight

13   inches tall and weighing 238 pounds, she claims her weight should be considered in conjunction

14   with her other impairments, including diabetes with peripheral neuropathy, degenerative disc and

15   joint disease, migraine headaches, and asthma.

16           Obesity must be considered as a factor contributing to disability, unless the ALJ

17   makes a specific factual finding based on substantial evidence that the obesity is remediable.

18   <u>Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1993).  SSR 02-01p makes clear that obesity is a

19   disease that must be considered when evaluating disability, and the "combined effects of obesity

20   with other impairments can be greater than the effects of each of the impairments considered

21   separately."  The ALJ "will evaluate each case based on the information *in the case record*."

22   (<u>Id.</u>) (emphasis added).  Even if it is ultimately determined that listing equivalence is not

23   satisfied, the ALJ must take into account the fact of obesity at the other levels of the sequential

24   analysis.  At step four and five of the sequential analysis, the ALJ should consider obesity in

25   determining RFC and vocational ability:

26           According to the Social Security Rules, in evaluating obesity to

10

1   determine a claimant's RFC, the ALJ's assessment 'must consider
2   an individual's maximum remaining ability to do sustained work
    activities in an ordinary work setting on a regular and continuing
3   basis.' SSR 02-01p (2002).  As with other impairments, the ALJ
    should explain how he determined whether obesity caused any
4   physical or mental impairments.  *See id.*

5   Burch v. Barnhart, 400 F.3d 676, 683 (9th Cir. 2005).

6          In Burch, consideration of plaintiff's obesity at step three was analyzed in light of

7   Celaya v. Halter, 332 F.3d 1177 (9th Cir. 2003).  The Celaya factors are whether, despite

8   plaintiff's failure to specifically raise obesity, it was raised as a disabling factor in plaintiff's

9   report of symptoms, whether it was clear from the record that the obesity was close to the listing

10  criterion, and could exacerbate the other alleged impairments, and whether the ALJ should have

11  been on notice of the need to develop the record on obesity due to plaintiff's pro se status, in

12  light of his observation of plaintiff and other information in the record.  Id. at 1182.

13         Of course, the courts cannot legislate the specifics of  what "consideration" of

14  obesity means as the degree to which obesity affects one's normal daily activities can range from

15  minimal to substantial.  The "consideration" has to take into account many variables such as age,

16  extent to which one uses a weight bearing joint, the existing injury to the joint, the strength of the

17  muscles surrounding the joint, and so forth.  And all obesities are not equal in terms of potential

18  remediation.  Some, if not many, can completely remediate an obesity problem, while others at

19  the other end of the spectrum will be completely unable to affect their obesity status because of

20  glandular or other bodily problems.  And, it is the rare Social Security claimant who will present

21  the ALJ with a Mayo Clinic long term study of the claimant's obesity.  In the vast majority of

22  cases, the only fact presented to the ALJ is the obesity *vel non*.  In this case, the plaintiff's weight

23  of 238 on a 5'8" frame result is a general BMI of 36.2 (over 30 is defined as obese).  Centers for

24  Disease Control and Prevention, BMI calculator, www.cdc.gov/obesity/defining.html and

25  www.cdc.gov.healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/result.  The

26  \\\\\

11

1   obesity is not extreme or morbid.[7]  In sum, there are no defined standards by which to judge the

2   ALJ's consideration of obesity, and one should therefore not be overly critical of an ALJ's

3   analysis.

4          Here, the ALJ specifically found plaintiff's obesity to be a severe impairment.  He

5   also considered it at step three, in combination with her other impairments.  He first noted that

6   there was insufficient objective testing on plaintiff's musculoskeletal system to meet that listing.

7   Plaintiff's diabetes was well controlled in the main without frequent acidosis and no end organ

8   damage.  The ALJ then noted that although obesity may cause more pain and limitation with

9   arthritis than arthritis without the obesity, no physician has mentioned any findings that would

10  equate to a listing.  (Tr. at 15.)

11         The ALJ also acknowledged that plaintiff's obesity contributed to limitations in

12  plaintiff's ability to lift, carry, stand, walk and sit for prolonged periods.  (Id.)  He included these

13  limitations in his hypothetical to the expert:

14         The undersigned told the expert to assume that such a person
           retained the residual functional capacity to perform work tasks
15         which involve lifting/carrying/pushing/pulling 10 pounds
           occasionally and 5 pounds frequently; sitting for eight of eight
16         hours with normal breaks; standing/walking for eight of eight
           hours with normal breaks; occasional stooping, crouching,
17         crawling and kneeling; occasional postural activities; and frequent
           grasping and fingering and which allow for the opportunity to sit
18         and stand at will while not leaving the work station and which
           restrict the climbing of ladders, ropes and scaffolding.
19

20  (Id. at 18.)  This hypothetical took into consideration all the limitations plaintiff might experience

21  as a result of her obesity and other impairments.  Given the record, it is difficult to believe that

22  this plaintiff could not meet these very minimal physical standards.

23         The ALJ's comment that plaintiff's obesity could be addressed by diet and

24  exercise was not improper.  As previously set forth, plaintiff was told on several occasions to diet

25

26         [7]  Depending on the extent of muscle mass in the body, a BMI in excess of 40 is generally
        considered morbidly obese.

1   and exercise; if the plaintiff's condition could not be remediated by such, it is not at all apparent

2   why the doctors would recommend this to her.  There is nothing in the record, even plaintiff's

3   testimony, which indicates that despite her best efforts, the weight continued to increase.

4                   Moreover, plaintiff's apparent non-attempts at remediating her other ailments

5   lends credence to the inference that she did not try to remediate her weight problem.  For

6   example, the only specialist plaintiff appeared to have visited was Dr. Pagdan, and it appears she

7   saw him only twice for her migraine headaches.  (Tr. at 302-03.)  Although he directed plaintiff

8   to keep a headache log and return in one month, she did neither.  (Id.)  Plaintiff also did nothing

9   to control her diabetes.  She testified that she was not aware of the American Diabetes

10  Association's diet, and had not discussed any special diet for diabetes with her doctor.  (Id. at 34,

11  301.)  On the contrary, plaintiff was advised to diet and exercise numerous times.  (Id. at 563,

12  433, 420.)  Additionally, plaintiff did not try to improve her knee condition.  She testified that

13  although surgery was recommended for her meniscus tear, she did not want to undergo it because

14  she was "scared."  (Id. at 36.)  In fact, surgery was not yet recommended; however, plaintiff was

15  advised to undergo physical therapy and water therapy first.  (Id. at 416.)  She was referred to

16  UCD for physical therapy, but it does not appear that she followed up with that program other

17  than going a couple of times.  Although plaintiff's asthma worsened over time, it appears to have

18  been controlled.  (Id. at 422, 563.)  There are no reports of hospital visits for this problem.  It is

19  important to note that plaintiff smokes cigarettes and was advised to stop and pay attention to

20  triggers.  (Id. at 276, 229, 225, 323.)

21                  This evidence shows that plaintiff's other impairments could have been better

22  controlled with more specialized medical treatment and effort to follow physicians' advice on her

23  part, even if she was under no duty to control her weight.  They were also not significant enough

24  in and of themselves such that when combined with her obesity they would cause her to be

25  disabled.  The ALJ's analysis of plaintiff's obesity at every step of the sequential analysis is

26  \\\\\

13

1  supported by what evidence existed.[8]

2     C.  Whether the ALJ Failed to Properly Credit Plaintiff's Testimony and Third Party

3  Statements Regarding Plaintiff's Functional Limitations

4        Plaintiff sets forth a number of reasons why the ALJ improperly rejected her

5  credibility.

6        The ALJ determines whether a disability applicant is credible, and the court defers

7  to the ALJ who used the proper process and provided proper reasons.  See, e.g., Saelee v. Chater,

8  94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit

9  credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v.

10  Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

11  supported by "a specific, cogent reason for the disbelief").

12        In evaluating whether subjective complaints are credible, the ALJ should first

13  consider objective medical evidence and then consider other factors.  Vasquez v.  Astrue, 547

14  F.3d 1101 (9th Cir. 2008);  Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc).  The

15  ALJ may not find subjective complaints incredible solely because objective medical evidence

16  does not quantify them.  Bunnell at 345-46.  If the record contains objective medical evidence of

17  an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged

18  symptoms, including aggravating factors, medication, treatment, and functional restrictions.  See

19  id. at 345-47.  The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior

20  inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to

21

22

23        [8]  Further difficulty in the analysis exists because obesity is becoming a common human
condition in what is known as "the West," as opposed to a disability.  For example, thirty-four
percent of adults over age twenty in the United States were obese in 2007 and 2008.
24  www.cdc.gov.nchs/fastats/overwt.html.  See also New York State Rest. Etc. V. New York Brd of
Health, 556 F.3d 114, 135 (2nd Cir. 2009).   Clearly, not everyone over age twenty who is obese
25  can qualify for social security benefits simply because of that fact if the Trust Fund is to have any
integrity at all.  There must be clear indications in the record that one's obesity significantly
26  exacerbates an existing medical condition.

1  follow a prescribed course of treatment; and (3) daily activities.[9]  Smolen v. Chater, 80 F.3d

2  1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR

3  55406-01; SSR 88-13.  Work records, physician and third party testimony about nature, severity,

4  and effect of symptoms, and inconsistencies between testimony and conduct, may also be

5  relevant.  Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ

6  may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453,

7  1458 (9th Cir. 1989), which cannot substitute for medical diagnosis.  Marcia v. Sullivan, 900

8  F.2d 172, 177, n.6 (9th Cir. 1990).  Plaintiff is required to show only that her impairment "could

9  reasonably have caused some degree of the symptom."  Vasquez, 547 F.3d at 1104, *quoting*

10  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007, Smolen, 80 F.3d at 1282.  Absent

11  affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony

12  must be clear and convincing, and supported by reference to specific facts in the record.

13  Vasquez, 547 F.3d at 1104-05.

14          The ALJ found plaintiff was not credible in part in regard to the intensity,

15  persistence or functionally limiting effects of her pain and other symptoms because they were not

16  substantiated by the objective medical evidence which was largely lacking.  (Id. at 16.)  For

17  example, he noted that she could move all of her extremities in a satisfactory manner, and she

18  exhibited normal sensory capabilities and muscle strength.  The ALJ also concluded that

19  plaintiff's diabetes was under control and had not resulted in any significant organ damage or

20  secondary associated conditions.  Plaintiff received appropriate treatment for headaches, and the

21  blindness in her left eye had been present since childhood.  The ALJ also stated that plaintiff had

22  received only conservative treatment for her conditions, and surgery had not been recommended.

23

24          [9]  Daily activities which consume a substantial part of an applicants day are relevant.
"This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily
25  activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in
any way detract from her credibility as to her overall disability.  One does not need to be utterly
26  incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)
(quotation and citation omitted).

1  (Tr. at 16.)  The ALJ then discussed all of the objective findings which showed that plaintiff's

2  impairments were not as severe as alleged.  He stated:

3      Radiological findings have been generally unremarkable.
        Although a congenital variant anatomy was seen which may result
4       in altered alignment and may predispose the claimant for knee
        instability and early degenerative joint disease, a study of the
5       bilateral knees in September 2006 noted no acute findings or
        significant degenerative changes [].  A Nerve Conduction Study in
6       February 2007 was normal, noting no evidence of neuropathy.  X-
        ray study of the right wrist, shoulder and elbow was normal in
7       March 2007 [].  Upon an eye examination in May 2007, deep
        amblyopia was seen, but there was no diabetic retinopathy or
8       diabetic macular edema [].  Moderate narrowing of the medial joint
        compartment of the knees was observed in a June 2007 study [].  A
9       study of the knees showed no abnormalities in September 2007 [],
        but a subsequent MRI study in October 2007 showed a right knee
10      tear involving the anterior horn of the lateral meniscus and joint
        effusion [].  Right wrist tendinopathy was identified in March 2008
11      [].  A lumbar spine examination in June 2008 showed no obvious
        impairment [].  In August 2008, a lumbosacral MRI revealed
12      degenerated L4-5 and L5-S1 discs, but no significant compression
        of any of the nerve roots [].

13

14  (Tr. at 17.) (Exhibit numbers omitted).

15      Finally, the ALJ summarized and placed significant weight on Dr. Selcon's

16  consultative opinion which found that plaintiff had no physical functional limitations.  (Id.)

17      Plaintiff first contends that the ALJ's finding that plaintiff could still move her

18  arms and legs failed to undermine her testimony about her severe pain and functional limitations.

19  She describes shooting pain and numbness in her wrist and arm when she tried to do certain

20  activities, such as writing and stirring food in a pot.  (Id. at 43.)  She also refers to her pain in her

21  back, knee and foot, which prevents her from standing, walking or sitting for long periods.  (Id. at

22  45, 47.)  The record, reflects, however, that plaintiff received very conservative treatment for

23  these problems.  She did not follow through with physical therapy and surgery was not

24  \\\\\

25  \\\\\

26  \\\\\

16

recommended.[10]  Plaintiff had only limited symptoms in her knee.  (Id. at 499.)  An x-ray of

plaintiff's right arm and wrist was normal.  (Id. at 333-35.)  Exam of plaintiff's right upper

extremity, back and both knees was normal, with no tenderness and normal range of motion.  (Id.

at 277.)  Dr. Selcon noted in his report that plaintiff did not walk with a limp and used no

assistive device.  (Id. at 276.)   The ALJ was free to rely on this consultant's opinion over

plaintiff's testimony because he provided specific reasons.

    In regard to plaintiff's diabetes, her testimony as described above was that she was

not any special diet to control this condition.  (Id. at 34.)  Plaintiff refers to two records indicating

that her diabetes was not under control.  (Id. at 499, 563.)  Those records are the only references

to uncontrolled diabetes in the years of notes in the transcript.  The remainder of the record

indicates that her diabetes was controlled.  In any event, diabetes is the sort of impairment that

can be controlled.  A condition which can be controlled or corrected by medication is not

disabling.  See Montijo, 729 F.2d at 600.  The fact that she developed peripheral neuropathy

indicates only that plaintiff did not control her diabetes as she should have.  "In many cases,

peripheral neuropathy symptoms improve with time - especially if it's caused by an underlying

condition that can be treated.  A number of medications are often used to reduce the painful

symptoms of peripheral neuropathy."  www.mayoclinic.com.

    Plaintiff's migraine headaches have been previously discussed.  Plaintiff did not

follow through with a neurologist and her outcome from these headaches would have been better

had she done so.  The fact that she had to go to the hospital three[11] times in a two month period

indicates only that she was not properly controlling her migraines during this time period.  In

fact, she reported that during this time period she had previously been under the care of a

---

 [10]  Surgery was discussed in regard to plaintiff's right knee, but plaintiff was to try physical therapy first.  (Id. at 499.)

 [11]  The June 22, 2007 visit was a continuation of the June 20th visit, wherein she obtained some relief, left the hospital, but then the pain returned the next day.  (Id. at 353.)  Therefore, plaintiff only had two migraines severe enough to warrant a hospital visit.

1  neurologist but was seeking a new neurologist.  (Id. at 353.)  The ALJ could properly reject

2  plaintiff's credibility where the evidence indicated that plaintiff did not do all that could have

3  been done to control her headaches.

4          Plaintiff continues to assert that knee surgery was recommended when the actual

5  orthopedics chart note specifically states, "[s]he should continue with her PT with planned

6  follow-up in six to eight weeks.  She will remain symptomatic.  We would consider arthroscopic

7  at that time." (Tr. at 499.)  The chart note to which plaintiff refers is third hand information,

8  based on plaintiff's report.  (Id. at 416.)  Even if surgery had been recommended, plaintiff

9  reported at that time that she "wants to try PT and water therapy first." (Id.)  The fact remains

10  that plaintiff did not follow through with the recommended physical therapy and did not

11  undertake water therapy, and did not try to mitigate her condition.  See Meanel v. Apfel, 172

12  F.3d 1111, 1114 (9th Cir. 1999) (plaintiff's claim of extreme pain inconsistent with "minimal,

13  conservative treatment" received); Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ

14  correctly considered conservative nature of treatment in determining credibility).

15          "Credibility determinations are the province of the ALJ." Andrews v. Shalala, 53

16  F.3d 1035, 1043 (9th Cir.1995).  In this regard, questions of credibility and resolutions of

17  conflicts in the testimony are functions solely of the [Commissioner].  See Yuckert v. Bowen,

18  841 F.2d 303, 307 (9th Cir. 1988); Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982)."

19  Morgan v. Apfel, 169 F. 3d at 599.  The ALJ properly analyzed the evidence in relation to the

20  appropriate factors required by the Bunnell line of cases.

21          Plaintiff also objects to the ALJ's failure to explain what weight, if any, he gave to

22  the third party statement of plaintiff's friend and former co-worker, Evon Duncan.

23          An ALJ is required to "consider observations by non-medical sources as to how

24  an impairment affects a claimant's ability to work." Sprague v. Bowen, 812 F.2d 1226, 1232 (9th

25  Cir. 1987).  "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must

26  take into account, unless he or she expressly determines to disregard such testimony and gives

1   reasons germane to each witness for doing so." <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir.

2   2001) (citing <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996)).  Similar to the ALJ's role

3   in evaluating the testimony of a claimant, when evaluating the testimony of a lay witness "[t]he

4   ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for

5   resolving ambiguities." <u>Sousa v. Callahan</u>, 143 F.3d 1240, 1243 (9th Cir. 1998) (quoting

6   <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995)).

7           The Ninth Circuit has held that the ALJ must properly discuss lay witness

8   testimony, and that any failure to do so is not harmless unless no reasonable ALJ, when fully

9   crediting the testimony, could have come to a different disability determination. <u>Stout v.

10  Commissioner</u>, 454 F.3d 1050, 1053 (9th Cir. July 25, 2006).

11          As a preliminary matter, the statement at issue was not testimony and was not

12  signed under penalty of perjury.  (Tr. at 158-65.)  Therefore, the standards applicable to

13  testimony do not apply to this third party's statements.

14          In any event, Ms. Duncan stated in her questionnaire that she talks to plaintiff on

15  the phone almost every day and plaintiff is either lying down or asleep.  (Tr. at 158.)  The ALJ

16  did address this third party statement, noting Ms. Duncan's observations that plaintiff gets really

17  bad headaches and has pain in her joints, arms and legs.  Plaintiff's daughter helps her mother.

18  (<u>Id.</u> at 16.)  The information contained in this statement is cumulative to the evidence set forth

19  and thoroughly addressed by the ALJ.  The ALJ thoroughly discussed plaintiff's testimony as

20  outlined above.  (<u>Id.</u> at 16.)  Therefore, to the extent that the ALJ did not specifically reject this

21  lay witness statement, he was not required to do so because it was not "testimony."  Furthermore,

22  any error was harmless error based on the reasons set forth above.  An error which has no effect

23  on the ultimate decision is harmless. <u>Curry v. Sullivan</u>, 925 F.2d 1127, 1121 (9th Cir. 1990).

24  \\\\\

25  \\\\\

26  \\\\\

1  CONCLUSION

2          For the reasons stated herein, IT IS ORDERED that: Plaintiff's Motion for

3  Summary Judgment is denied; the Commissioner's Cross-Motion is granted; and the Clerk is

4  directed to enter Judgment for the Commissioner.

5  DATED: 11/01/2010                              /s/ Gregory G. Hollows

6                                                 _____
                                                  GREGORY G. HOLLOWS
7                                                 U.S. MAGISTRATE JUDGE
   GGH/076
8  Smith 1982.ss.wpd

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26